IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

CLINT PORTEOUS,                                    Civ. No. 6:23-cv-01840-AA
individually and on behalf of
others similarly-situated,

                        Plaintiff,                 **OPINION & ORDER**

            v.

FLOWERS FOODS, INC.;
FLOWERS BAKERIES, LLC;
FLOWERS BAKING CO. OF
PORTLAND, LLC,

                        Defendants.
_____

AIKEN, District Judge.

    This case comes before the Court on a Motion to Compel Individual Arbitration,

Strike Class and Collective Allegations, and Stay the Proceedings, ECF No. 27, filed

by Defendants Flowers Foods, Inc., Flowers Bakeries, LLC, and Flowers Baking Co.

of Portland, LLC.  For the reasons set forth below, the motion to compel arbitration

is DENIED and the motion to strike is GRANTED.

## LEGAL STANDARDS

## I.    Motion to Compel Arbitration

    The Federal Arbitration Act ("FAA") provides that arbitration agreements

"shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.  Courts may decline to

enforce an arbitration agreement if grounds "exist at law or in equity for the revocation of any contract." *Id.* Otherwise, courts must treat arbitration agreements the same as other contracts. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). "Courts strongly favor arbitration and broadly construe arbitration clauses." *Sanders v. Concorde Career Colls., Inc.*, 3:16-CV-01974-HZ, 2017 WL 1025670, at *2 (D. Or. Mar. 16, 2017). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (internal quotation marks and citations omitted). "The standard for demonstrating arbitrability is not high." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999).

When evaluating a motion to compel arbitration, courts should determine: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys. Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). When determining the validity of an agreement to arbitrate, a court "should apply state-law principles that govern the formulation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). If the court finds that there is a valid agreement that encompasses the dispute, then the court must enforce the agreement in accordance with its terms. Arbitration agreements may be invalidated by generally applicable contract defenses, such as duress or unconscionability. 9 U.S.C. § 2; *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 697 (1996). Upon granting a petition to compel arbitration, district courts

must stay the proceedings.  9 U.S.C. § 3; *Smith v. Spizzirri*, 601 U.S. 472, 476-78 (2024).

## II.    Motion to Strike

The court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.  Fed. R. Civ. P. 12(f).  Motions to strike under Rule 12(f) are viewed with disfavor and are infrequently granted.  *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 561 F. Supp.2d 1187, 1189 (D. Or. 2008), *aff'd*, 608 F.3d 1084 (9th Cir. 2010); *see also Capella Photonics, Inc. v. Cisco Sys., Inc.*, 77 F. Supp.3d 850, 858 (N.D. Cal. 2014) ("Motions to strike are regarded with disfavor because of the limited importance of pleadings in federal practice and because they are often used solely to delay proceedings.") (internal quotation marks and citations omitted, alterations normalized).  Granting a motion to strike is within the discretion of the district court.  *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010).

## BACKGROUND

## I.    Flowers, Inc. and its Subsidiaries

Defendant Flowers Foods, Inc. ("Flowers Foods") is a national packaged bakery food company, which "bakes, sells, and distributes" bread and other baked goods throughout the country.  Compl. ¶ 24.  ECF No. 1.  Defendant Flowers Bakeries LLC ("Flower Bakeries") is a subsidiary of Flowers Foods.  Stewart Decl. ¶ 3.  ECF No. 28.  Defendant Flowers Baking Co. of Portland, LLC ("FBC Portland") is a wholly owned subsidiary of Flowers Bakeries and Flowers Foods is the ultimate

parent company. *Id.* Collectively, the Court will refer to the three companies—Flowers Foods, Flowers Bakeries, and FBC Portland—as "Flowers."

## II.    The Direct Store Delivery System

Flowers baked goods are shipped to the retail outlets through a direct-store-delivery ("DSD") system. Compl. ¶ 24; Stewart Decl. ¶ 6.   In the DSD system, Flowers "establishes a web of wholly-owned subsidiary companies to enter into agreements" with DSD Drivers "who are charged with delivering the bakery products from the warehouse to the retail locations and keeping the shelves stocked." Compl. ¶ 25; *see also* Stewart Decl. ¶ 6.

Flowers maintains that DSD Drivers are independent contractors and "advertises routes as independent business opportunities" for DSD Drivers. Compl. ¶ 26; *see also* Stewart Decl. ¶ 6 ("To bring bakery products to market, FBC Portland contracts with independent distributor franchisees."). Under this model, the DSD Drivers purchase the product from Flowers, on terms and prices set by Flowers. Compl. ¶ 26; Stewart Decl. ¶ 12. The DSD Drivers then "take ownership of the product, and then resell the product to retail outlets within their territories at a profit." Compl. ¶ 27; *see also* Stewart Decl. ¶ 12. DSD Drivers "are responsible for operating their businesses, including hiring employees at their discretion to run their businesses; identifying and engaging potential new customers; developing relationships with key customer contacts; ordering products based on customer needs; servicing the customers in their territory; stocking and replenishing product at customer locations; removing stale product; and other activity necessary to

promote sales, customer service, and otherwise operate their businesses." Stewart Decl. ¶ 10. DSD Drivers "are contractually obligated to use their 'Best Efforts' to increase sales in their territories." *Id.* at ¶ 11.

DSD Drivers "assume the risk of loss for non-payment by Flowers' retail customers, loss resulting from missing or otherwise unaccounted-for inventory, and loss resulting from excess stale products." Compl. ¶ 28. "In its description of this tripartite relationship, Flowers states that it will merely carry accounts receivable for these retail accounts and credit the retail sales price" to the DSD Driver. *Id.* at ¶ 29.

Plaintiff alleges that, in reality, Flowers "itself negotiates, carries out, and receives gross proceeds from the vast majority of bakery sales which are in turn merely delivered by its 'distributors' who receive a commission on Flowers' sales." Compl. ¶ 32. DSD Drivers "do not, for example, have a contract with the local Wal-Mart within their territory and have no control over the price Wal-Mart agrees to pay Flowers for products that distributors put on Wal-Mart's shelves." *Id.* at ¶ 33. "Price, product selection, and event product placement within these retail locations" are all controlled by Flowers. *Id.* Plaintiff alleges that, in its SEC filings, Flowers "explicitly admits that it bears risk of loss and owns title to the products until the retailer or end consumer (like Wal-Mart) actually takes possession." *Id.* at ¶ 34. In these filings, the DSD Drivers are referred to as "agents" and Flowers is referred to as the principal. *Id.* at ¶ 35.

### III.    Plaintiff Clint Porteous

Plaintiff Clint Porteous is the owner of CPORT Distributing, Inc. ("CPORT"). Stewart Decl. ¶ 6.  CPORT entered into a Distributor Agreement with FBC Portland in October 2016.  *Id.*  As part of that Distributor Agreement, discussed in greater detail below, Plaintiff signed a Personal Guaranty under which he personally guaranteed the performance of the terms of the Distributor Agreement by his company.  Stewart Decl. Ex. 1, at 35.

The territory covered by the CPORT Distributor Agreement is entirely within the State of Oregon and does not require the operator to cross state lines.  Stewart Decl. ¶ 7.  However, the majority of products that were delivered under the Distributor Agreement were produced out-of-state in response to specific orders and shipped to a warehouse in Bend, Oregon, where Plaintiff would pick them up for delivery.  *Id.* at ¶ 13.

Plaintiff personally operated the route covered by the Distributor Agreement for five years.  Porteous Decl. ¶ 2.  ECF No. 31-15.  Plaintiff estimates that he spent between 40 and 50 hours driving the products to retailers each week and, on days when free product was not delivered, he would spend between four and six hours per day checking to make sure the product was adequately stocked and rotated at the retailers.  *Id.* at ¶ 7.

### IV.    The Distributor Agreement

CPORT and FBC Portland entered into a Distributor Agreement effective October 10, 2016.  Stewart Decl. ¶ 6.  CPORT and Plaintiff individually as the

"owner" of CPORT entered into an Arbitration Agreement, identified as Exhibit K to the Distributor Agreement. *Id.* at ¶ 8. Plaintiff also signed a Personal Guaranty, identified as Exhibit F of the Distributor Agreement, under which he personally guaranteed performance and compliance with the terms of the Distributor Agreement by CPORT. *Id.* at ¶ 9. As part of the Personal Guaranty, Plaintiff also agreed that he was subject to the Arbitration Agreement. Stewart Decl. ¶ 9.

As noted, the Distribution Agreement identifies itself as being between FBC Portland and CPORT. Stewart Decl. Ex. 1, at 3. The Distributor Agreement identifies CPORT as an "independent contractor." *Id.* The Distributor Agreement provides a series of standards and requirements that CPORT is to comply with as the distributor, at the end of which the Distributor Agreement states that CPORT "specifically acknowledges and agrees that such standards do not reflect control by [Flowers] as to the specific details or manner and means of DISTRIBUTOR's business, but only reflect only [Flowers]'s interest in the results achieved by DISTRIBUTOR, protecting the reputation of the brands, and protecting the business reputation of both DISTRIBUTOR and [Flowers]." *Id.* at 5.

The Distributor Agreement provided CPORT with the right to distribute baked goods from Flowers within a defined territory. Stewart Decl. Ex. 1, at 4. CPORT's territory is described in Exhibit A of the DA and is entirely within the State of Oregon. *Id.* at 25-27.

The Distributor Agreement states that "[t]itle and risk of loss" pass to CPORT upon delivery and that the products will be "sold to DISTRIBUTOR at such

terms and prices as established by [Flowers] from time to time." Stewart Decl. Ex. 1, at 6. CPOT was to use "commercially reasonable best efforts to develop and maximize the sale of Products to Outlets within the Territory." *Id.*

### A. The Arbitration Agreement

The Arbitration Agreement, attached as Exhibit K to the Distributor Agreement, provides that "any claim, dispute, and/or controversy, except as specifically excluded," between CPOT and Flowers "arising from, related to, or having any relationship or connection whatsoever with the Distributor Agreement . . . shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act[.]" Stewart Decl. Ex. 1, at 40.

The Arbitration Agreement contains a waiver of collective and class action: "All Covered Claims against [Flowers] must be brought by DISTRIBUTOR on an individual basis only and not as a plaintiff or class member in in any purported class, collective, representative, or multi-plaintiff action." Stewart Decl. Ex. 1, at 40. In bold font and capital letters, the Arbitration Agreement provides:

> **TO THE MAXIMUM EXTENT PERMITTED BY LAW, BOTH PARTIES EXPLICITLY WAIVE ANY RIGHT TO: (1) INITIATE OR MAINTAIN ANY COVERED CLAIM ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF BASIS EITHER IN COURT OR ARBITRATION; (2) SERVE OR PARTICIPATE AS A REPRESENTATIVE OF SUCH CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION; (3) SERVE OR PARTICIPATE AS A MEMBER OF ANY SUCH CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION; OR (4) RECOVER ANY RELIEF FROM ANY SUCH CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF ACTION.**

Stewart Decl. Ex. 1, at 40 (emphasis in original).

"Covered Claims" under the Arbitration Agreement include "any claims challenging the independent contractor status of DISTRIBUTOR, claims alleging that DISTRIBUTOR was misclassified as an independent contractor, any other claims premised upon DISTRIBUTOR's alleged status as anything other than an independent contractor . . . and any claims for alleged unpaid compensation, civil penalties, or statutory penalties under either federal or state law." Stewart Decl. Ex. 1, at 41. This is repeated in another section of the Arbitration Agreement: "The parties also agree that nothing herein is intended to, or does, affect or otherwise change the independent contractor relationship between them[.]" *Id.* at 42.

**B. The Personal Guaranty**

The Distributor Agreement also includes a Personal Guaranty, attached as Exhibit F. Stewart Decl. Ex. 1, at 35. Under the Personal Guaranty, Plaintiff, as an individual, guaranteed and stood as surety to Flowers "for the performance and compliance with the terms, conditions and obligations" of the Distributor Agreement. Stewart Decl. Ex. 1, at 35. In addition, Plaintiff agreed and acknowledged that he was personally "subject to the Arbitration Agreement attached herein as Exhibit K." *Id.*

## DISCUSSION

Flowers seeks to compel arbitration in this matter, pursuant to the Arbitration Agreement, and moves to strike the class and collective allegations in the Complaint as inconsistent with the provisions of the Distributor Agreement that limit Plaintiff to his individual claims.

Plaintiff asserts that the Arbitration Agreement is not enforceable under the Federal Arbitration Act ("FAA") under the transportation worker exception and that it is not enforcement under Oregon law because Oregon law is inconsistent with the FAA. Plaintiff maintains that, if the Arbitration Agreement is not enforceable, then the waiver of collective and class action rights is similarly unenforceable.

## I.    The Transportation Worker Exception

The FAA promotes a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*, 460 U.S. 1, 24 (1983). As noted, the FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. However, the FAA exempts certain categories of workers from the provisions of the statute, specifically exempting "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Even when an arbitration agreement confers the right to determine whether a dispute comes within the bounds of the agreement to the arbiter, a court must first determine whether § 1 applies. *New Prime, Inc. v. Oliveira*, 586 U.S. 105, 112 (2019). Here, Plaintiff asserts that he falls within that final category, the "class of workers engaged in foreign or interstate commerce."

Flowers contends that § 1 does not apply for three reasons: (1) Plaintiff executes a distinct intrastate transaction and so is beyond the scope of § 1; (2) the Distributor Agreement is a commercial contract between to business entities and not

a "contract of employment"; and (3) Plaintiff belongs to a class of franchise owners who need not transport goods personally. The Court will address each in turn.

## A. Plaintiff is a "last-mile" delivery driver in an unbroken stream of interstate commerce.

In *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904 (9th Cir. 2020), the Ninth Circuit considered whether delivery drivers were exempt from the FAA by § 1. In that case, the plaintiff delivery drivers, who were classed by Amazon as independent contractors, made "last mile" deliveries of products from Amazon warehouses to their destination, most often without crossing state lines. *Rittman*, 971 F.3d at 907. The plaintiffs challenged their classification as independent contractors and sought to bring nationwide FLSA claims against Amazon. *Id.* at 908. Amazon sought to enforce an arbitration agreement on the plaintiffs' claims, arguing that the transportation worker exception in § 1 of the FAA did not apply because transportation workers must actually cross state lines to be "engaged in interstate commerce." *Id.* at 908-09. The Ninth Circuit rejected that construction of § 1, holding that § 1 "exempts transportation workers who are engaged in the movement of goods in interstate commerce, even if they do not cross state lines." *Id.* at 915. The Ninth Circuit held that because the packages delivered by the plaintiffs did not "come to rest" in the Amazon warehouses, the "last mile" delivery driver plaintiffs were part of a chain of interstate commerce. *Id.* at 916-17.

In 2022, the Supreme Court addressed the scope of § 1 of the FAA in *Southwest Airlines Co. v. Saxon*, 596 U.S. 450 (2022). In that case, the plaintiff was a ramp

supervisor who loaded and unloaded baggage, airmail, and commercial cargo on and off airplanes that traveled across the country. *Id.* at 453. The plaintiff brought a putative class action alleging violation of the FLSA. *Id.* at 454. Southwest sought to enforce an arbitration agreement with the plaintiff and, in response, the plaintiff invoked § 1, arguing that she was a covered worker engaged in interstate commerce. *Id.* The Supreme Court found that it was "too plain to require discussion" that "airline employees who physically load and unload cargo on and off planes traveling in interstate commerce are, as a practical matter, part of the interstate transportation of goods," and that "a worker is engaged in transportation, when she is doing the work unloading or loading cargo from a vehicle carrying goods in interstate commerce." *Id.* at 457-59 (internal quotation marks and citation omitted). As a result, the plaintiff was covered by § 1 of the FAA. *Id.* at 463.

In another recent case, *Carmona Mendoza v. Domino's Pizza, LLC*, 73 F.4th 1135 (9th Cir. 2023), the Ninth Circuit revisited the application of § 1 to delivery drivers. In *Carmona Mendoza*, the plaintiffs were "last leg" delivery drivers who delivered ingredients from a Domino's supply center to Domino's franchisees. *Id.* at 1136. The plaintiffs filed a putative class action alleging violation of California labor laws and Domino's sought to enforce arbitration agreements with the plaintiffs. *Id.* The Ninth Circuit found that, as in *Rittmann*, the drivers were exempted from the FAA under § 1 as transportation workers engaged in interstate commerce. The Ninth Circuit found that the drivers "operate in a single, unbroken stream of interstate commerce that renders interstate commerce a central part of their job description"

and that "[b]ecause the goods in this case were inevitably destined from the outset of the interstate journey for Domino's franchisees, it matters not that they briefly paused that journey at the Supply Center." *Id.* at 1138 (internal quotation marks and citations omitted).

Together, *Rittman, Saxon,* and *Carmona Mendoza* paint a clear picture—when there is a continuous stream of interstate commerce, those who work directly in the movement of goods in that stream are covered workers under § 1 of the FAA. This is so, even if their work within the stream of commerce does not involve the worker personally crossing state lines, as in the case of the "last mile" delivery drivers in *Rittmann* and *Carmona Mendoza* or the cargo loader in *Saxon*.

The Tenth Circuit recently issued a decision, *Brock v. Flowers Food, Inc.*, 121 F.4th 753 (10th Cir. 2024), in which it considered facts nearly identical to the present case. In *Brock*, the plaintiff, through his company Brock, Inc., was contracted to work as an independent distributor with Flowers Foods, Flowers Bakeries, and Flowers Denver, a local Flowers subsidiary analogous to FBC Portland. *Id.* at 757-58. As in the present case, the plaintiff would pick up product from a Flowers warehouse and then deliver it to "various stores that serve as his end customers." *Id.* at 758. Also like the present case, the relationship between Flowers and the plaintiff was governed by a distributor agreement, which included an arbitration agreement and a personal guaranty acknowledging that the plaintiff was personally subject to the arbitration agreement. *Id.* at 758-59.

The *Brock* plaintiff filed a putative collective and class action claim against Flowers for violation of the FLSA and state labor laws, alleging that Flowers misclassifies its delivery driver distributors as independent contractors. *Brock*, 121 F.4th at 759. As in the present case, Flowers sought to compel arbitration under the FAA, arguing that the distributor agreement and the arbitration agreement required the plaintiff to arbitrate his claims individually. *Id.* The Tenth Circuit found that the plaintiff was a covered transportation worker under § 1 of the FAA, even though his deliveries were entirely intrastate, because he was involved in a continuous stream of commerce. *Id.* at 761-62. In reaching this conclusion, the Tenth Circuit adopted the Ninth Circuit's analysis concerning "last mile" delivery drivers in *Rittmann* and drew a direct connection between Flowers's driver distributors and the Amazon delivery drivers in *Rittmann*. *Id.* at 762-64.

The Tenth Circuit rejected the argument that the transaction between the *Brock* plaintiff and his customers (the retail stores) was a wholly separate from the interstate transportation of the product by Flowers, finding that they "form an integrated distribution chain, in which Flowers exercises a significant degree of control over Brock's operations." *Brock*, 121 F.4th at 767. "This control makes it evident to us that Brock serves as Flower's last-mile driver, because Flowers's real interest lies in delivering the baked goods to its true customer—the various retail stores on Brock's route, not Brock, Inc." *Id.* The Tenth Circuit noted the various requirements and strictures concerning handling and delivery of the goods imposed by the distribution agreement and found that "[h]ad the interstate delivery truly

ended, as Flowers claims, at the warehouse where Brock picked up the goods, Flowers should not have cared about Brock's actions after his receipt of the goods." *Id.* "Yet the terms of the Distributor Agreement belie Flowers's claim that the goods 'come to rest' at the warehouse." *Id.* "Viewing Brock's intrastate delivery in the context of the Distributor Agreement's terms and the interstate route that came before it, we are convinced that Brock serves as a last-mile driver for Flowers, such that he is directly engaged in interstate commerce" under 9 U.S.C. § 1. *Id.* at 768.

As in the present case, Flowers attempted to analogize the *Brock* plaintiff's role to that of rideshare and food-delivery drivers, which the Ninth Circuit has concluded were "'unaffiliated, independent participants in the passenger's overall trip, rather than an integral part of a single, unbroken stream of interstate commerce.'" *Brock*, 121 F.4th 769 (quoting *Capriole v. Uber Technologies, Inc.*, 7 F.4th 854, 867 (9th Cir. 2021)). The Tenth Circuit rejected this argument as "not an apt comparison," because the degree of control exercised by Flowers and the fact that the "true customers" were the retail stores placed the *Brock* plaintiff in the position of a "last-mile delivery driver." *Brock*, 121 F.4th at 769.

Given its close factual similarity to the present case and its adoption and application of the Ninth Circuit's holding in *Rittmann*, the Court finds the reasoning of *Brock* extremely persuasive. Here, as in *Brock*, Plaintiff is part of an unbroken stream of interstate commerce, notwithstanding the fact that his distribution territory is entirely intrastate. The degree of control exercised by Flowers over the manner of Plaintiff's deliveries indicates, as in *Brock*, that Flowers's true customers

are the retail stores and not Plaintiff, despite title to the goods notionally passing to Plaintiff when he picks up the goods at the warehouse. The Court concludes that Plaintiff is not removed from the scope of § 1 on this basis.

## B. Contract of Employment

As noted, § 1 of the FAA exempts "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Here, Flowers argues that the Distribution Agreement is not a "contract of employment" and so does not fall within the bounds of § 1.

In *New Prime, Inc. v. Oliveira*, the Supreme Court took up the question of what constituted a "contract of employment." 586 U.S. at 113. In that case, the plaintiff was classified as an independent contractor, rather than an "employee" and so the defendant argued that the agreement between them was not a "contract of employment." *Id.* The Supreme Court rejected that contention, finding that, at the time of the FAA's adoption, "a 'contract of employment' usually meant nothing more than an agreement to perform work." *Id.* at 114. "As a result, most people would have understood § 1 to exclude not only agreements between employers and employees but also agreements that require independent contractors to perform work." *Id.* The Supreme Court held that the term "contracts of employment" should be understood "in a broad sense to capture any contract for the performance of *work* by *workers*." *Id.* at 116 (emphasis in original).

In *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190 (9th Cir. 2024), several corporate entities acting as contracted "delivery service partners" ("DSP") for

Amazon filed a federal class action complaint on behalf of all current and former DSPs. *Id.* at 1192. Amazon invoked an arbitration agreement, and the plaintiff companies sought to avoid the application of the agreement by arguing that they were transportation workers within the meaning of §1 of the FAA. *Id.* at 1195. The Ninth Circuit rejected that argument, holding that "no business entity is similar in nature to the actual human workers enumerated by the text of the transportation worker exception." *Id.* at 1196. "While a natural person such as an independent contractor may be a transportation worker, a nonnatural person such as a business entity that employs or contracts with transportation workers, is not and cannot be a transportation worker." *Id.* Central to the Ninth Circuit's analysis was that, in *Fli-Lo Falcon*, "no plaintiff [was] a transportation worker." *Id.* "A Falcon *employee* may be a transportation worker playing a direct and necessary role in the free flow of goods across borders," but "that cannot turn Falcon into such a transportation worker." *Id.*

Relatedly, the Ninth Circuit held "that 'contracts of employment' in the transportation worker exemption do not extend to commercial contracts like the DSP Agreements." *Fli-Lo Falcon*, 97 F.4th at 1196 (emphasis in original). In order "for a contract to *be* a contract of employment covered by § 1, it must have a *qualifying worker* as one of the parties." *Id.* at 1196-97 (emphasis in the original). It was significant that the agreements in *Fli-Lo Falcon* called "for the transportation, delivery, and related services performed by the business entity that plaintiffs represent" and "even states that the [plaintiff companies] have exclusive

responsibility for their Personnel, including exclusive control over compensation, hours, and working conditions." *Id.* at 1197 (internal quotation marks omitted, alterations normalized).

Here, Flowers argues that the Distributor Agreement is a commercial contract between business entities—FBC Portland and CPORT—and so the limitations of *Fli-Lo Falcon* apply to bar the application of § 1.

There are two obvious distinctions between this case and *Fli-Lo Falcon*. First, unlike the plaintiffs in *Fli-Lo Falcon*, Plaintiff in this case is not a business entity. Plaintiff personally, and not CPORT, is seeking to bring claims against Flowers. CPORT is not a party to this action.

The second and more significant distinction between the present case and the DSP agreements in *Fli-Lo Falcon* is the presence of the Personal Guaranty. Plaintiff is personally bound to ensure CPORT's performance of the "terms, conditions and obligations" of the Distributor Agreement. Stewart Decl. Ex. 1, at 35. By operation of the Personal Guaranty, Plaintiff is also personally bound by the Arbitration Agreement and, indeed, Flowers seeks to enforce the Arbitration Agreement as to Plaintiff. The Distributor Agreement also give Flowers significant control over how CPORT conducted its business, Stewart Decl. Ex. 1, at 4-5, 7, 10-11, and, by operation of the Personal Guaranty, Plaintiff was also personally bound by those obligations.

The Court concludes that these differences, and particularly the Personal Guaranty, materially distinguish the facts this case from the more conventional commercial contracts involved in *Fli-Lo Falcon*. The arrangement memorialized by

the Distributor Agreement is a contract for "work" to be performed by a "worker" and so it falls within the broad definition of "contract of employment" established by *New Prime*.

## C. Plaintiff's Personal Involvement

Flowers argues that nothing in the Distribution Agreement required Plaintiff to perform the work personally and that, as a franchise business owner, he is not a "transportation worker" within the meaning of § 1. Indeed, some provisions of the Distributor Agreement expressly contemplate that the work could be done by employees of CPOT. *See, e.g.,* Stewart Decl. Ex. 1, at 16. However, it is undisputed that Plaintiff *did* personally perform the transportation work required by the Distributor Agreement and he seeks to bring claims based on the work he personally performed.

In sum, the Court concludes that the Distributor Agreement qualifies as a contact of employment and Plaintiff qualifies as a transportation worker such that § 1 of the FAA will apply. Accordingly, the Court declines to compel arbitration under the FAA.

## II. Oregon Law

Flowers argues that, even if § 1 of the FAA does apply, Oregon state law will still compel arbitration. Oregon law provides that an arbitration agreement is "valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of the contract." ORS 36.620(1). Flowers maintains that because there

is no transportation worker exception in the Oregon arbitration statutes, arbitration is still compulsory.

Plaintiff contends that Flowers's argument is foreclosed by the language of the Arbitration Agreement itself. In interpreting contracts, the Oregon Supreme Court has set forth the following analysis:

> To resolve a dispute over the meaning of a contractual provision, this court first considers the text of the disputed provision in the context of the contract as a whole to determine whether the disputed provision is ambiguous. A contractual provision is ambiguous if its wording can, in context, reasonably be given more than one plausible interpretation. Whether a provision is ambiguous is a question of law, as is the meaning of an unambiguous provision. The court must, if possible, construe the contract so as to give effect to all of its provisions. If the meaning of the provision is clear from the text and context, then the analysis ends.

*Williams v. RJ Reynolds Tobacco Co.*, 351 Or. 368, 379-80 (2011) (internal citations omitted).

Here, the Arbitration Agreement provides that covered claims "shall be submitted to and determined *exclusively* by binding arbitration under the Federal Arbitration Act." Stewart Decl. Ex. 1, at 40 (emphasis added). "This Arbitration Agreement shall be governed by the FAA and Oregon law to the extent Oregon law is not inconsistent with the FAA." *Id.* at 42.

There is no ambiguity in these provisions. The text and context both clearly establish that the FAA is to be given primacy, and that Oregon law applies only so long as it is not inconsistent with the FAA. The fact that there is a transportation worker exception in the FAA and not in the Oregon statute is an obvious inconsistency between the statutes. By the plain terms of the Arbitration Agreement,

Oregon law does not apply where it is inconsistent with the FAA. *See Brock v. Flowers Foods, Inc.*, 673 F. Supp.3d 1180, 1189-90 (D. Colo. 2023) (considering an identical clause in an arbitration agreement and concluding that Colorado law does not apply because it was inconsistent with the FAA).

Flowers argues that courts routinely find that state law can compel arbitration when § 1 of the FAA applies. *See, e.g., Romero v. Watkins and Shepard Trucking, Inc.*, No. 20-55768, 2021 WL 3675074, at *2 (9th Cir. Aug. 19, 2021) (enforcing an arbitration agreement under Nevada law after finding that § 1 of the FAA applied). However, Plaintiff does not argue, and the Court does not find, that operation of the § 1, in and of itself, prevents enforcement of state arbitration statutes. Rather, application of the Oregon arbitration statute is barred by the plain terms of the Arbitration Agreement in this case. The Court declines to compel arbitration under Oregon law.

### III.    Collective Action Claims

Plaintiff has brought putative class and collective action claims, which Flowers has moved to strike. The parties agree that, if the Arbitration Agreement is enforceable, Plaintiff is required to arbitrate his claims solely on an individual basis. Plaintiff argues that if the motion to compel arbitration is denied then there is no basis on which to strike the class and collective action allegation in the Complaint.

The Arbitration Agreement provides, in bold and capitalized letters:

> To the maximum extent permitted by law, both parties explicitly waive any right to: (1) initiate or maintain any covered claim on a class, collective, representative, or multi-party basis *either in court or in arbitration*; (2) serve or participate as a representative of any such class,

collective, or representative action; (3) serve or participate as a member of any such class, collective, or representative action; or (4) recover any relief from any such class, collective, representative, or multi-plaintiff action.

Stewart Decl. Ex. 1, at 40 (emphasis added).

By its plain terms, the Arbitration Agreement also prevents Plaintiff from maintaining a class or collective action on a "covered claim" in court, as well as in arbitration. There is no dispute that Plaintiff's claims in this case are "covered claims." *See* Stewart Decl. Ex. 1, at 41 ("Covered Claims" include claims challenging Plaintiff's status as an independent contractor, or any claims premised on the assertion that Plaintiff is anything other than an independent contractor). The Arbitration Agreement also contains a severability clause, providing that if any provision of the Agreement is found to be unenforceable, it shall be severed and "all remaining terms and provisions shall continue in full force and effect." Stewart Decl. Ex. 1, at 41-42.

The Ninth Circuit has held that, "although class action waivers are often found in arbitration agreements . . . the two contractual terms are *conceptually distinct*." *Laver v. Credit Suisse Secs. (USA), LLC*, 976 F.3d 841, 846 (9th Cir. 2020) (internal quotation marks and citation omitted, alterations normalized, emphasis in original). An arbitration agreement is "a promise to have a dispute heard in some forum *other than a court*," while a class action waiver is "a promise to forego a procedural right to pursue class claims." *Id.* (emphasis in original).

In *Barnett v. Concentrix Solutions Corp.*, No. CV-22-00266-PHX-DJH, 2022 WL 17486813 (D. Ariz. Dec. 7, 2022), the district court considered the question of

whether FLSA class action waivers were enforceable outside of the arbitration context and found that district courts within the Ninth Circuit have enforced FLSA class action waiver brought outside the arbitration context "on the rationale that bringing a collective action under the FLSA is a procedural, not substantive, right." *Id.* at *4-6 (collecting cases). The Court finds this reasoning persuasive.

Consistent with those cases, the Court concludes that the class and collective action waiver is distinct from the agreement to arbitrate, and, by operation of the severability clause, it survives the Court's determination that the agreement to arbitrate is unenforceable. Because it explicitly waives Plaintiff's procedural right to bring a class or collective action in both arbitration and in court, it will prevent Plaintiff from maintaining class or collective action claims in the present action. The Court will therefore grant Flowers's motion to strike the collective and class action allegations.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Compel Arbitration is DENIED and Defendants' Motion to Strike the Class and Collective Action Allegations of the Complaint is GRANTED. ECF No. 27. Plaintiff is to submit a conforming complaint within fourteen (14) days of the date of this Order.

It is so ORDERED and DATED this ___12th___ day of February 2025.

/s/Ann Aiken_____
ANN AIKEN
United States District Judge