**NICHOLAS & TOMASEVIC, LLP**
Craig M. Nicholas (CA SBN 178444)*
Alex Tomasevic (CA SBN 245598)*
Shaun Markley (CA SBN 291785)*
Jordan Belcastro (CA SBN 339570)*
225 Broadway, 19th Floor
San Diego, California 92101
Tel: (619) 325-0492
Fax: (619) 325-0496
Email: cnicholas@nicholaslaw.org
Email: atomasevic@nicholaslaw.org
Email: smarkley@nicholaslaw.org
Email: jbelcastro@nicholaslaw.org

*Pro Hac Vice*

**LEIMAN LAW, P.C.**
Alan J. Leiman (OR SBN 980746)
P.O. Box 5383
Eugene, Oregon 97405
Tel: (541) 345-2376
Email: alan@leimanlaw.com

Attorneys for Plaintiff,
CLINT PORTEOUS

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# EUGENE DIVISION

| | |
|---|---|
| CLINT PORTEOUS, an individual,<br><br>   Plaintiff,<br><br>   vs.<br><br>FLOWERS FOODS, INC., a Georgia corporation; FLOWERS BAKERIES, LLC, a Georgia limited liability company; and FLOWERS BAKING CO. OF PORTLAND, LLC, an Oregon limited liability company,<br><br>   Defendants. | Case No. 6:23-cv-01840-AA<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>1. **Failure to Pay Overtime under the FLSA (29 U.S.C. § 207(a)(1))**<br><br>2. **Failure to Pay Overtime under Oregon Law (ORS 653.261(1)(a); OAR 839-020-0030)**<br><br>3. **Unlawful Deductions under Oregon Law (ORS 652.610; OAR 839-020-0020)**<br><br>4. **Breach of Contract**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Clint Porteous ("Plaintiff" or "Porteous") files this Amended Complaint against Defendants Flowers Foods, Inc., Flowers Bakeries, LLC, and Flowers Baking Co. of Portland, LLC (collectively, "Defendants" or "Flowers"), seeking all available relief under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA") and Oregon's wage and hour laws, including ORS 652.610, ORS 653.261, OAR 839-020-0020, and OAR 839-020-0030 (collectively, the Oregon statutes and regulations are referred to as the "Oregon Wage and Hour Laws"). The following allegations on based on personal knowledge as to Plaintiff's own conduct and are made on information and belief as to the acts of others.

## NATURE OF ACTION

1.  Flowers deploys an elaborate independent contractor misclassification scheme to cheat its employees, its competition, and the state and federal governments. Flowers does so by willfully and systematically misclassifying its hundreds of delivery drivers as "Independent Contractors" (sometimes referred to as "Delivery Employees" or "Distributors" throughout). In doing so, Flowers denies these Delivery Employees, including the named Plaintiff, access to critical benefits and protections they are entitled to by law, such as minimum wage, overtime compensation, and indemnification for business expenses/deductions. Through its willful misclassification, Flowers also robs the federal and state governments of tax revenues and generates losses to state unemployment insurance and workers' compensation funds and gets an undue advantage over its law-abiding competition.[1]

2.  Flowers sells billions of dollars of baked goods to retailers throughout the United States. To help sustain its profits, Flowers has concocted a model where it advertises "independent

---

[1] *See* U.S. Dept. of Labor, Wage and Hour Division, "Misclassification of Employees as Independent Contractors," available at https://www.dol.gov/whd/workers/Misclassification/ (describing the repercussions of misclassification) (last accessed November 3, 2023).

contractor" distributor opportunities. As part of the model, Flowers makes Delivery Employees purchase a specific sales territory in which the Delivery Employee is supposedly going to purchase, take title to, re-sell, and distribute Flowers' bakery products to the Delivery Employees' prearranged (by Flowers) customers. The Delivery Employees often pay in excess of $100,000 for the right to the "independent business opportunity" outlined in Flowers' advertisements and its uniform Franchise Disclosure Document and Distributor Agreement ("DA").

3. In short, Flowers sells the notion that these "independent contractors" will run and control their own sales-based business with their own customers for their own profit and gain. But Flowers never actually operates its business under these terms, despite Delivery Employees' heavy investment and reliance on the promises Flowers makes.

4. In reality, the distributor role is far from "independent." For example, for the vast majority of product sales, Flowers itself contracts directly with its own large retailer customers (like Walmart and Costco) and maintains title over the baking products until the retailers take possession. But in no case do Delivery Employees ever actually receive title to products that go into Flowers' retail locations. Instead, Delivery Employees merely deliver the product and stock Flowers' customers' shelves for a non-negotiable commission that Flowers unilaterally establishes.

5. Flowers also dictates the set route or territory that the Delivery Employees sell within. Flowers maintains control over that territory or route with respect to things like which Flowers' products will be available, price, shelf space, displays, and promotions. Flowers also unilaterally dictates when unsold bakery products must be reclaimed from retail locations (a.k.a. "stales" or stale product) as dictated by its retail customers and passed down to Delivery Employees. Curiously, even though Flowers purports to pass "title" to the bakery products to the

"independent distributors," Flowers mandates that stale products must be returned to Flowers warehouse and not used for any other purpose by the Delivery Employees, even where they are forced to pay market price for them.

6.  Flowers also dictates which products and brands of goods will be sold within each territory. Notably, if Flowers elects to change which retailers it serves or which brands it will carry. This is true even where Flowers drastically devalues the Delivery Employee's route because Flowers unilaterally chose to discontinue a certain brand or stop selling to a particular retailer within that route.

7.  Flowers also hires management and sales employees at each of its local, regional subsidiaries to carry out sales and to directly supervise and instruct the so-called "independent distributors" in performance of their distribution and merchandizing responsibilities within their routes.

8.  Flowers also controls the Delivery Employees' appearance as well as the appearance of their vehicle. For example, Flowers can make Delivery Employees paint their vehicles to Flowers' specifications or remove advertising that the Delivery Employee has chosen for his/her vehicle.

9.  Delivery Employees must also abide by "Good Industry Practices" as defined unilaterally by Flowers. Failure to abide by any of these requirements risks termination by Flowers and often results in "breach notices" by Flowers where it insists on specific performance obligations with the threat of fines or termination.

10.  As such, rather than operating the sales-oriented independent business promised to them, Delivery Employees primarily carry out a vital portion of Flowers' direct-store-delivery ("DSD") business operations—delivering and merchandizing bakery products to Flowers retail

customers for a set commission.

11. The discrepancy between the business model set forth in Flowers' DA and the one actually put in place by Flowers is not accidental. Flowers sees its DSD model, and specifically the use of "independent distributors," as a significant competitive advantage. It wants, and legally it needs, the appearance of separate, independent businesses to avoid having to treat "distributors" as employees. Yet, at the same time Flowers must be able to ensure delivery to its blue-chip retail customers and control the timely and effective distribution of its products pursuant to the terms of its contracts with those retailers. Attempting to walk this invisible line or to simply capture the best of both worlds, Flowers presents the illusion of independence in its DA and related advertisements with no intention of actually operating its business as necessitated by its retail customers and its personal preference.

12. Plaintiff is a Distributor who entered into the DA with Flowers in 2016.

## THE PARTIES

13. Plaintiff Clint Porteous is an adult individual who, at all relevant times when he personally performed work as a Distributor for Flowers was a resident of the state of Oregon. Plaintiff served as a "Distributor" from approximately 2016 through present. In late 2021, Plaintiff moved out of state and has had a helper operate his territory during that period. He only seeks to recover wages for the periods where he personally operated a territory for Flowers from 2016-2021.

14. Plaintiff is a covered employee within the meaning of Oregon Wage and Hour Laws.

15. Defendant Flowers Foods, Inc. ("Flowers Foods"), is a publicly traded Georgia corporation with its principal place of business in Thomasville, Georgia (NYSE:FLO). It is a

leading manufacturer and seller of bakery goods in the United States with gross profits of over $1.9 billion in 2017 (and of over $581 Million in the first quarter alone of 2018). It does business in Oregon, including Portland, by establishing subsidiaries with the intent of carrying out operations in this region. This entity establishes layers of national and regional subsidiaries to carry out its sham "independent distributor" business model that in fact just secures workers to carry out the delivery and merchandizing of Flowers' customers' retail locations. Flowers Foods ultimately takes responsibility for and recognizes all revenue generated from its sale of bakery goods through its local subsidiaries and its Delivery Employees. It also guarantees and assumes responsibility for the performance of its subsidiaries that execute the DA with Delivery Employees (sometimes called "local subsidiaries") throughout Oregon. Specifically, "Flowers Foods, Inc. will absolutely and unconditionally guarantee the performance by [its local subsidiary] of [the subsidiary's] obligations under the Distributor Agreement." As a result, Flowers Foods, along with Flowers Bakeries, LLC, are ultimately, and jointly, responsible for these claims.

16.     Flowers Bakeries, LLC, is a Georgia limited liability corporation with its principal place of business in Thomasville, Georgia. This entity is the Flowers Foods subsidiary that is charged with sales-related activities. It negotiates with retailers on things such as price, shelf space, and service requirements that are then carried out by the Delivery Employees at the direction of the local subsidiaries. Results of these high-level deals make their way down through the local subsidiaries to the Delivery Employees.

17.     One step further down the Flowers' chain is the local DSD subsidiaries such as Flowers Baking Co. of Portland, LLC. Its only member is Flowers Bakeries, LLC (who in turn is entirely owned by Flowers Foods). These local subsidiaries are set up to execute the policies and instructions passed down from the higher up Flowers entities (the Defendants). Each local

subsidiary has a president, a vice president of sales, and a director of distributor relations, along with several directors of sales/sales managers. These employees execute sales and pricing agreements as well as visit the actual brick-and-mortar locations that Flowers has contracted to service to keep up customer relationships and ensure the Delivery Employees are meeting their needs as specified in the Flowers Foods negotiated contracts (that Delivery Employees ultimately are tasked with carrying out). They also act as the go-between for Delivery Employees and the other Flowers entities.

18. All of these entities, including Defendants, are part of the Flowers enterprise that jointly and collectively manufacture, advertise, sell, and distribute bakery products throughout Oregon and the United States. They operate jointly in carrying out the common fraud and misclassification against their Delivery Employees and the state of Oregon.

## JURISDICTION

19. This Court has original subject matter jurisdiction over Plaintiff's FLSA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b). In addition, the court has supplemental jurisdiction over Plaintiff's state law class action claims pursuant to 28 U.S.C. § 1367.

20. This Court has personal jurisdiction over Defendants because they do business in Oregon and in this District.

## VENUE

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiff and Defendants reside in this District, and a substantial part of the events giving rise to the claims occurred in this District.

## GENERAL ALLEGATIONS

### A.   Overview of Flowers' Business

22.   Flowers Foods, Inc. is a leading national packaged bakery foods company. It bakes, sells, and distributes breads, buns, rolls, snack cakes, and tortillas, among other items throughout the country under well-known brand names like "Wonder Bread," "Sunbeam," "Tasty Cake," "Nature's Own," and "Dave's Killer Bread." It has two business segments—a direct-store-delivery segment ("DSD Segment") and a warehouse delivery segment. The DSD Segment is at issue here. It produces a wide variety of fresh bakery foods that are sold through a DSD route delivery system to Flowers' retail and foodservice customers in Oregon and other locations.

23.   Within the DSD segment, Flowers Foods, Inc. establishes a web of wholly-owned subsidiary companies to enter into agreements with the "Delivery Employees," such as Plaintiff, who are charged with delivering the bakery products from the warehouse to the retail locations and keeping the shelves stocked. According to Flowers Foods, Inc.'s website, it "sells its products through a network of independent distributors [*i.e.*, Delivery Employees] to retail and foodservice customers." (https://www.flowersfoods.com/investors/flo-overview/at-a-glance.) These Delivery Employees are, thus, integral to Flowers' normal business operations—and they are selling for Flowers, not themselves.

### B.   How Flowers Sells Its So-Called "Independent Distributor Opportunity" to Delivery Employees

24.   Flowers classifies Delivery Employees as "independent contractors" and advertises routes as independent business opportunities for Delivery Employees where the Delivery Employees supposedly buy product from Flowers and re-sell it for a profit. Specifically, in disclosure documents, Flowers represents that the independent contractor Delivery Employee will

"pay [Flowers] for the bakery products [distributor] purchase[s] for resale to [distributor's] outlets." It reiterates that Flowers "will sell [bakery products] to [distributor] at terms and prices established by [Flowers], and [Flowers] will derive income from these sales. Upon delivery, these products will belong to [the distributor]."

25. Flowers makes the same representations in the form DA presented to every Delivery Employee. Flowers states that, under its system, it seeks to divide its bakery goods market into territories operated by "independent contractor distributors." Flowers claims to grant the right both to sell and distribute authorized Flowers products within the territory. Under this model, as described in the DA, the Delivery Employee will purchase from Flowers, take ownership of the product, and then resell the products to retail outlets within their territories at a profit.

26. By claiming that the Delivery Employee is "purchasing" the products from Flowers, Flowers feels it can pass certain business risks to the Delivery Employee. So, Flowers makes the Delivery Employees, like Plaintiff, assume the risk of loss for non-payment by Flowers' retail customers, loss resulting from missing or otherwise unaccounted for inventory, and loss resulting from excess stale products.

27. In short, and in no uncertain terms, the disclosure documents and the DA claim that: (1) Flowers sells bakery products to Delivery Employee; (2) Delivery Employee takes title; and (3) Delivery Employee re-sells to retailers at a profit. In the scenario described by Flowers, Flowers makes a profit by selling to the distributor and passing off title at that time. The Delivery Employee then executes its own independent sale to the retailer. Furthermore, Flowers describes itself, in the DA, as merely the agent of the Delivery Employee in reaching agreements for purchases with retail chain accounts that the Delivery Employee then executes. In its description

of this tripartite relationship, Flowers states that it will merely carry accounts receivable for these retail accounts and credit the retail sales price to Delivery Employees.

28. Flowers uses its described business model to both (1) justify the "independent" nature of Delivery Employees in an effort to support its misclassification of them as independent contractors, and to (2) justify passing business losses and risks to the Delivery Employees who supposedly "take title" to the products.

### C.  Flowers' *Actual* Business Model

29. Flowers' representations in its disclosure documents and in its DA are false as evidenced by its own statements and accounting policies. To summarize, Flowers represents to Delivery Employees that they own the product and control their destinies. It does that to justify its misclassification of the Delivery Employees as "independent contractors," and to thus avoid the wages, employer-side taxes, and other protections and burdens that would normally come with properly categorizing these workers as "employees." It also does this to justify passing certain risks and losses to the Delivery Employees. But on the other hand, and as proven by its actions as well as what Flowers tells accountants and the Securities and Exchange Commission ("SEC"), Flowers is the one that controls the entire enterprise and actually owns the product. Upon information and belief, this allows Flowers to claim higher revenues and present a healthier business to potential customers and its investors. In short, Flowers is having its cake and eating it too.

30. More specifically, rather than selling to and vesting rights in the distributors to make retail sales, Flowers itself negotiates, carries out, and receives gross proceeds from the vast majority of bakery sales which are in turn merely delivered by its "distributors" who receive a commission based on Flowers' sales. The reality of selling products to national retailers like Wal-

Mart and Costco is that deals are negotiated on a national, or at least regional level and then simply carried out by the local subsidiaries that make up Flowers' DSD Segment. Sales to these retailers account for over 75% of Flowers' business in the increasingly corporate "big retail" market that exists in the United States and Oregon.

31. Flowers' own website and SEC filings confirm that the distributors merely have "the right to distribute," and that sales are actually made and controlled by Flowers (*i.e.*, Flowers sells products "through" distributors). It is Flowers who enters contracts for retail purchase and negotiates all relevant retail terms like pricing. Individual distributors do not, for example, have a contract with the local Wal-Mart within their territory and have no control over the price Wal-Mart agrees to pay Flowers for products that distributors put on Wal-Mart's shelves. Price, product selection, and even product placement within these retail locations are all controlled by Flowers well above the Delivery Employees' level of operation.

32. Under Flowers' actual business model, Delivery Employees do not, in-fact, take title and then resell the products. Instead, Flowers executes sales with retail locations and "distributors receive a percentage of the wholesale price of product sold to retailers and other customers." In doing so, and as a matter of accounting, Flowers then actually recognizes the sale to the retail customer as revenue "at the time of delivery when title and risk of loss pass to the [retail] customer." *See* Flowers' SEC Form 10-K for fiscal year ended January 1, 2011 ("2011 SEC Filing") at p. F-7. Flowers does not recognize the revenue when it supposedly "sells" the products to the Delivery Employees because no sale to these individuals actually occurs. Indeed, in its SEC filings, Flowers explicitly admits that it bears risk of loss and owns title to the products until the retailer or end consumer (like Wal-Mart) actually takes possession. This directly contradicts the representations that Flowers makes to its "distributors," including in the DA, where

Flowers claims the Delivery Employees "buy" the product from Flowers and own it upon taking possession.

33. Flowers' recent quarterly SEC filing removes any doubt that the DA and its related disclosures are a sham. In its filing, Flowers explicitly admits that, for purposes of sales to its retail chain customers (the vast majority of Flowers products sold), Flowers is the principal, and the employee distributor is the "agent." *See* Flowers' Form 10-Q for the quarterly period ended April 21, 2018 ("2018 SEC Filing"), at p. 9. This directly contradicts what Flowers told the employee distributors, including Plaintiff, in the franchise disclosure and the DA.

34. In that recent filing, Flowers also admits again that revenue is recognized based on the retail sales price (as opposed to the wholesale price it supposedly "sells" products to the Delivery Employee for) only once product is delivered to the end customer. Additionally, "[t]he company retains inventory risk, establishes . . . pricing, and fulfills the contractual obligations for [retail] sales." *See* 2018 SEC Filing at p. 9-10. Again, Flowers wants to save money on wages and employment taxes by claiming that employees are "independent distributors," but it needs to maintain control over the enterprise, the products, and the distribution networks to satisfy its other financial and accounting goals.

35. Additional facts proving Flowers' control over the relationship with its Delivery Employees (and thus the falsity of the "independent contractor" classification) are as follows:

    a. Delivery Employees are forced to incorporate and retain a majority ownership in their corporation. *I.e.*, they cannot choose their own business form. This forced corporation then enters into the DA with the Flowers Foods, Inc. subsidiary to show the appearance of a business-to-business relationship.

b.  Despite the forced incorporation, the Delivery Employee himself or herself must personally guarantee the contract. The personal guarantee makes the individual Delivery Employee liable for performance under and compliance with the DA. This gives Flowers its desired individual employee.

c.  Flowers assigns each Delivery Employee a set route and set brands of Flowers' bakery products to sell within that route to Flowers' retail customers. Delivery Employees pay for the rights to the route. The price is usually $100,000 or more, financed by Flowers at excessive interest rates. Flowers then automatically deducts the principal and interest from the commissions otherwise owed to the Delivery Employees.

d.  Flowers also controls: (i) which retailers will receive which Flowers' products within the territory; (ii) the price its retailers pay for products; and (iii) which products and brands of goods will remain available to the retailers and, in turn, to the Delivery Employees.

e.  Flowers maintains the right to change which retailers it and its Delivery Employees serve and which brands will be sold to those retailers or otherwise available within a Delivery Employee's territory.

f.  When Flowers makes changes to the products offered and/or the retailers it offers them to, it does not re-value the route the Delivery Employee originally bargained for or otherwise re-evaluate the money the individual owes to Flowers for that route. This is true even where Flowers has drastically reduced the value of a given route by unilaterally choosing to discontinue a product or stop selling to a retailer in that territory.

g.  Flowers deploys a management structure within each local subsidiary including branch and/or sales managers who manage relationships with retail customers, carry out sales, and directly supervise and instruct the Delivery Employees in performance of their responsibilities. Again, the distributors are not "independent." They have bosses at Flowers.

h.  Flowers also dictates when unsold bakery products must be reclaimed from retail locations (a.k.a. "stales" or stale product). Flowers demands that such products, despite supposedly being the "property" of the Delivery Employee, be returned to a Flowers warehouse for Flowers' further benefit or re-sale, not the Delivery Employees. For example, if there is stale product within a Delivery Employee's territory above the threshold level unilaterally established by Flowers, Flowers charges the Delivery Employee retail price for the products but maintains possession of these products itself and, on information and belief, sells these products to its thrift customers.

i.  Delivery Employees must also agree to maintain a certain physical appearance for both themselves and their vehicles. Flowers retains and exercises the right to force Delivery Employees to paint their vehicles to Flowers' specifications or remove advertising that the Delivery Employees have chosen for their vehicle.

j.  Delivery Employees must abide by "Good Industry Practices" as defined by Flowers. Failure to abide by any of these requirements risks termination by Flowers.

k.  The DA has no end date and Delivery Employees often work for Flowers for long periods of time. Per Flowers, these are "long-term financing arrangements."

l.  Flowers sets a calendar or schedule of days that Delivery Employees must work and what tasks are to be completed on those dates (*i.e.*, managing inventory vs. dropping new product). Flowers also requires that work be performed on the route each day of the week as its customers require and expect under their contracts with Flowers. Flowers describes its frequency of deliveries and shelf-stocking as "an increasingly important competitive factor" over its competition and it needs to control Delivery Employees to perform accordingly.

m.  Requiring inventory counting each week.

n.  Controlling when and who a Delivery Employee may sell a route to.

o.  Finally, when Flowers cannot find a Delivery Employee to service a particular route or territory, it uses its own employees to perform the same distribution and merchandizing work. Also, when Flowers is starting up in a new area, it uses a temp agency (that classifies drivers as employees) to conduct this very same work. In short, Flowers and other companies routinely treat individuals performing the same work as Delivery Employees as employees and not independent contractors. The choice to make Delivery Employees "independent contractors" is simple cost avoidance. *See, e.g.*, Flowers' 2018 SEC Filings at p. 47 ("In the current quarter, a larger portion of our sales were made through independent

distributors resulting in increased distributor distribution fees as a percent of sales and decreased workforce-related costs as a percent of sales . . . [which, among other things] resulted in a decline in workforce related costs."); and *see e.g.*, Flowers' SEC Form 10-K for fiscal year ended December 28, 2013 ("2014 SEC Filing") at p. 39 ("The increase in workforce-related costs was primarily attributable to the Lepage and Sara Lee California acquisitions as they generally did not use independent distributors to deliver product for the majority of 2013. We transitioned the Sara Lee California and are transitioning the Lepage operations to the independent distributor model which will, over time, decrease the workforce-related costs and increase the distributor distribution fees.")

### D.  Flowers Deducts Wages from Its Distributor Employees

36. Flowers deducts and fails to reimburse several types of expenses incurred by Delivery Employees in the course of their work. For example, Delivery Employees pay for vehicles-related expenses (gas, maintenance, insurance, etc.) as well as "handheld" and warehouse fees from weekly Delivery Employee pay. Moreover, Flowers actually charges Delivery Employees, including Plaintiff, for the pleasure of delivering for Flowers. For instance, Flowers charges recurring, non-negotiable fees as part of their operation. This includes, but is not limited to a warehouse fee, an administrative fee, and a technology fee (for use of Flowers' required handheld computer equipment).

37. Flowers also charges Delivery Employees for (excess) stale, lost, stolen, or otherwise unaccounted retail inventory. As such, distributors illegally serve as insurers of the Flowers' merchandise.

## COUNT 1

### Failure to Pay Overtime under the FLSA

### 29 U.S.C. § 207(a)(1)

38. Plaintiff incorporates by reference every allegation contained above.

39. Plaintiff brings this cause of action on behalf of himself.

40. The FLSA (Section 207(a)(1)) requires overtime pay at a rate not less than one and one-half times an employee's regular rate for work over forty hours in a week.

41. Plaintiff regularly worked between 50 and 70 hours per week in accord with Flowers' required hours to complete the work assigned to him. Yet Flowers never paid any Plaintiff any of the overtime pay.

42. Flowers knows that Plaintiff is improperly classified and that he work well over 40 hours per week, but intentionally and willfully fails to provide overtime premium pay.

43. Plaintiff is thus entitled to, and hereby seeks, unpaid overtime for hours worked in excess of forty in a week, plus interest, liquidated damages, penalties, costs and attorney's fees as provided by the FLSA.

## COUNT 2

### Failure to Pay Overtime under Oregon Law

### ORS 653.261(1)(a); OAR 839-020-0030

44. Plaintiff incorporates by reference every allegation contained above.

45. Plaintiff brings this cause of action on his own behalf .

46. Oregon law requires employers to pay "one and one-half times the regular rate" for work in excess of forty hours in one week.

47. As stated *supra*, Distributors, including Plaintiff, routinely work between 50 and 70 hours per week.

48. Flowers knows that these distributors are improperly classified and that they work well over 40 hours per week, but intentionally and willfully fails to provide overtime premium pay.

49. Plaintiff is thus entitled to, and hereby seek, unpaid overtime for hours worked in excess of forty in a week, plus interest, liquidated damages, penalties, costs and attorneys' fees as provided by Oregon law, ORS 653.055.

## COUNT 3

### Unlawful Deductions under Oregon Law

### ORS 652.610; OAR 839-020-0020

50. Plaintiff incorporates by reference every allegation contained above.

51. Plaintiff brings this cause of action on his own behalf.

52. Plaintiff and other Delivery Employees are "employees" under ORS 652.310 and are entitled to the benefits provided by Oregon law. This includes the right to be free from deductions under ORS 652.610 and OAR 839-020-0020.

53. As set forth above, Flowers passes a host of expenses along to its Delivery Employees, including the delivery vehicle(s) and attendant costs of operating a delivery vehicle(s) along with a host of fees like warehouse, handheld, technology, and stale ("shrink") fees for outdated product that failed to sell, among others. These are deducted from the employees' pay each week and/or otherwise not reimbursed by Flowers. Other expenses include handheld printer paper and wheeling devices for carrying bread.

54. Pursuant to ORS 652.615, employers, such as Defendants, who unlawfully deduct from employees' wages are liable for actual damages, in addition to costs and disbursements and reasonably attorneys' fees.

## COUNT 4

### Breach of Contract

55. Plaintiff incorporates by reference every allegation contained above.

56. Plaintiff brings this cause of action on his own behalf.

57. Plaintiff's Distributor Agreement grants him distribution rights within a designated geographic territory. The stores in this territory may change over time, but his distribution rights remain the same. A Newport Ave. Market store existed in his territory for years, but Flowers assigned a different Distributor to service that territory for the bulk of the time that he has worked as a Distributor until more recently correcting the assignment error and having Plaintiff serve the store.

58. Despite acknowledging that they did not grant Plaintiff all rights belonging to him when the store was serviced by another Distributor, Flowers refuses to pay Plaintiff the money it owes him for his margin on the products sold through the store while it was serviced by another Distributor.

59. This is a breach of the Distributor Agreement and entitles Plaintiff to the lost earnings that should have been his for products sold through the Newport store while it was erroneously and at the fault of Flowers operated by another individual.

60. The breach damaged Plaintiff via lost revenues.

### PRAYER FOR RELIEF

Plaintiff prays for judgment as follows:

1. An award of regular and overtime compensation due under the FLSA and the Oregon law;

2. An award of liquidated and/or punitive damages as a result of the Defendants' willful failure to pay regular and overtime compensation pursuant to the FLSA (*e.g.*, 29 U.S.C. § 216);

3. Compensation for unpaid amounts for the Newport Ave. Market;

4. An award of pre-judgment and post-judgment interest;

5. An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

6. For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues so triable.

Respectfully submitted:
Dated:  March 5, 2025

**NICHOLAS & TOMASEVIC, LLP**

By: */s/ Shaun Markley*
Craig M. Nicholas (CA SBN 178444)*
Alex Tomasevic (CA SBN 245598)*
Shaun Markley (CA SBN 291785)*
Jordan Belcastro (CA SBN 339570)*
225 Broadway, 19th Floor
San Diego, California 92101
Tel: (619) 325-0492
Fax: (619) 325-0496
Email: cnicholas@nicholaslaw.org
Email: atomasevic@nicholaslaw.org
Email: smarkley@nicholaslaw.org
Email: jbelcastro@nicholaslaw.org

* *Pro Hac Vice*

**LEIMAN LAW, P.C.**
Alan J. Leiman (OR SBN 980746)
P.O. Box 5383
Eugene, Oregon 97405
Tel: (541) 345-2376
Email: alan@leimanlaw.com

Attorneys for Plaintiff